UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MAHMOUD AMIN MOHAMED ELHASSAN,<br><br>Defendant. | Case 1:16-cr-00064<br><br><br><br>Alexandria, Virginia<br>February 24, 2017<br>9:50 a.m.<br><br><br>Pages 1 - 56 |

TRANSCRIPT OF SENTENCING

BEFORE THE HONORABLE ANTHONY J. TRENGA

UNITED STATES DISTRICT COURT JUDGE

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

APPEARANCES:

FOR THE PLAINTIFF:

DENNIS M. FITZPATRICK, ESQUIRE
OFFICE OF THE UNITED STATES ATTORNEY
2100 Jamieson Avenue
Alexandria, Virginia 22314
(703) 299-3700

FOR THE DEFENDANT:

THOMAS A. DURKIN, ESQUIRE
ROBIN V. WATERS, ESQUIRE
DURKIN & ROBERTS
2446 North Clark Street
Chicago, Illinois 60614
(312) 981-0123

STUART A. SEARS, ESQUIRE
SCHERTLER & ONORATO, LLP
901 New York Avenue, N.W., Suite 500 West
Washington, D.C. 20001
(202) 628-4199

THE DEFENDANT, MAHMOUD AMIN MOHAMED ELHASSAN, IN PERSON

THE CLERK: Criminal Case 1:16-cr-64, *United States of America v. Mahmoud Amin Mohamed Elhassan*.

Will counsel please identify themselves for the record.

MR. FITZPATRICK: Good morning, Your Honor. Dennis Fitzpatrick on behalf of the United States.

MR. DURKIN: Good morning, Judge.

THE COURT: Good morning.

MR. DURKIN: Tom Durkin and Stuart Sears on behalf of the defendant, who is present. Judge, also, I have with me my associate from Chicago, Robin Waters. She will not address the Court.

THE COURT: All right. Welcome to everyone.

MR. DURKIN: With your permission, if she can sit at the table?

THE COURT: Yes.

MR. DURKIN: Thank you.

THE COURT: We're here for sentencing.

Mr. Durkin, any objections to the presentence report other than those set forth in your filings?

MR. DURKIN: No, Judge. I'd also like to make note that we did not try to move for the minor role. We put that in the letter, but we decided against putting it in the pleadings.

THE COURT: All right. Fine.

MR. DURKIN: To that extent, that's just not an issue. We agree with the guidelines.

THE COURT: All right. I've reviewed your objections. Do you want to be heard any further on those objections?

MR. DURKIN: The only objection -- it's not worth debating, I don't think, since it's already out of the toothpaste. But I don't think it's appropriate to take into account conduct which he has not pled guilty to, has not been proven, and is not relevant conduct. That was our objection with respect to the --

THE COURT: The Medicare?

MR. DURKIN: -- Medicare. There are a lot of explanations for that.

THE COURT: Right.

MR. DURKIN: We referred in our submission to the fact that his sister was living in D.C. We could present issues with that. I don't think it's worth taking the Court's time. But just as a matter of law, I don't think it's appropriate.

THE COURT: All right. Thank you.

Mr. Fitzpatrick, any objections to the presentence report?

MR. FITZPATRICK: No, Your Honor.

THE COURT: All right. Are you continuing to

ask for a 4-level increase instead of a 3-level increase?

MR. FITZPATRICK: We are supporting the terrorism enhancements.

THE COURT: Right.

MR. FITZPATRICK: So we're asking the 12-level. Plus, the enhancement for obstruction of justice, we think, is properly applied. That's it. We think the ultimate guideline range properly calculated is an offense level of 37, a criminal history category VI.

THE COURT: Right.

MR. FITZPATRICK: We do agree -- I'll get into this more in a minute. Our position upon reading the papers is that the defendant's acceptance of responsibility in this case is rather tepid, but he has accepted responsibility. So we would also move for a 1-level decrease in the offense level.

THE COURT: All right. Do you want to be heard on the sentencing factors? Mr. Fitzpatrick, do you want to be heard?

MR. FITZPATRICK: Yes, Your Honor, if the Court please.

THE COURT: Yes.

MR. FITZPATRICK: With respect to the last

point that Mr. Durkin raised, while it's fresh, the issue regarding the $22,000 Medicaid fraud, that is properly included in the presentence report. I think the law is clear that, one, it goes to the history and characteristics of the defendant. Given the short time that he was in the country, that's a fairly egregious course of conduct that he committed. It is unadjudicated conduct, but there's nothing to prohibit the Court from considering unadjudicated conduct.

With respect to the sister, he wasn't living with his sister. He was living in a room above a storefront that was owned by another man. So I don't believe that the sister was involved in that.

With respect to the sentencing factors, Your Honor, as I think you've seen in our papers, we view this as an aggravated case. The defendant's conduct began shortly after he arrived in the United States from Sudan. The government's position, as we'll see in some of the documents here, is he was radicalized when he entered the United States.

If the Court pleases, if we could, turn to Exhibit A in the government's submission that we filed with the Court. I believe we brought a copy to chambers. I brought a binder to the Court's chambers a couple of days ago.

THE COURT: Hold on a second.

Do you want to get it?

I did look at it.

MR. FITZPATRICK: All right. I'll walk through this.

THE COURT: Which document are you referring to?

MR. FITZPATRICK: I'd like to start with A.

THE COURT: What is A?

MR. FITZPATRICK: A is the September 13 public screenshot of the defendant's Facebook page under his pseudonym Mahmoud Al-Dongulawi, IV. During the course of the defendant's conduct, Your Honor --

MR. DURKIN: Can we have the year?

MR. FITZPATRICK: 2013.

MR. DURKIN: Thank you.

MR. FITZPATRICK: Thank you, Your Honor.

During the course of the FBI's investigation, they identified no less than 10 Facebook pages and other social media outlets that the defendant was utilizing. During that time, he was expressing his violent jihadist tendencies on these social media sites.

On the September 13 Facebook page, he says, "The establishment of the governance of Allah on earth

will be achieved only by fighting in the cause of Allah. Allah exalted is He said: Fight them until there is no more" -- a couple of Islamic phrases -- "is all for Allah."

So he's expressing in 2013 his willingness to fight.

In Exhibit B, Your Honor, we see another Facebook page which the defendant created where his image is that of a stalking wolf. In the lower left-hand corner is the phrase, and it's literally translated in Arabic as Solo Wolf, easily translated into English as Lone Wolf. The next page shows a picture of the defendant. That is his Web site.

Critically, Your Honor, we go to Exhibit C. Exhibit C -- and I have to make one correction to this, Your Honor. Exhibit C is a chat that he has with Sheikh Al-Jazouli, a radical Sudanese jihadist who espouses violence across the world. This chat was conducted on December 3, 2013. The government was able to collect this chat beginning on June 2, 2014. So it is here in late 2013, and the translation is the first two pages. Then the original content follows.

The defendant says to Sheikh Al-Jazouli, "Praise be to Allah here with you is a sleeper cell. Sheikh pray for us for success and rewards." Then he

goes on expressing his desire to fight: Here with you is a sleeper cell. Perfectly consistent with his prior expression of himself as a Lone Wolf. This is dangerous conduct. It was in September of '13 that the FBI first became aware of the defendant's conduct and his tendencies, and he became a danger to the public.

I believe Mr. Durkin will say curiously: Well, in part, it will be the government's fault. The government didn't arrest my client soon enough. I always find that to be a curious argument. First of all, the government has to have sufficient proof to prove a case beyond a reasonable doubt. Those are the principles of federal prosecution.

MR. DURKIN: Judge, I don't mean to interrupt, but that's not what I'm going to say.

THE COURT: Well, you can tell me what --

MR. FITZPATRICK: If I'm wrong, Mr. Durkin will sure tell the Court.

THE COURT: I don't recall that from his filings by the way.

MR. FITZPATRICK: Thank you, Your Honor.

Still in Exhibit C, Your Honor, if you look at the original content, just to put a finer point on it, you'll see at the top of page -- there's a handwritten word "Elhassan." It says author. Those 15

digits there identify his device. Those resolved to his address in Woodbridge.

Notice the Arabic language between the 15 digits and the word "author." That is the same language, the same two Arabic words, that is in the Lone Wolf Facebook page. He's identifying himself to Sheikh Al-Jazouli as Solo Wolf or as Lone Wolf. I would submit to Your Honor that that's a critical fact in this case.

Turning to Exhibit D, you have December 23, 2014, "My doctrine" posting expressing the same violent tendencies.

Turning to Exhibit G, Your Honor, the defendant created another Facebook page. First, he has his image on the page. Then he changes his image to he's carrying a flag, and the page is called The Carrier of the Punishment Flag. He's expressing himself in solidarity with the Islamic State. Your Honor, this posting would have been consistent with or right about the time when the Islamic State was declaring through Abu Bakr Al-Baghdadi themselves as the caliphate.

Finally, Your Honor, Exhibit H I would just like to reiterate for the Court. This is a Facebook page where the defendant -- again, under his Mahmoud

Al-Dongulawi -- posts under his pseudonym. He has an image of part of the Islamic State flag.

Following that, Your Honor, is -- and this is the critical point to show the depth of the defendant's conduct. On this posting, he says, "One of our forgotten prisoners, I saw this brother in 2009 on YouTube" -- in 2009, the defendant was residing in Egypt -- "and I wished to work with him one day, but the 1st day I came to the states I found that the disbelievers imprisoned him." Below that is a link to Muslim Message To The Jews and Christians.

If you turn the page, that link takes you to a video of Sami Osmakac, someone who was espousing and planning serious attacks in Central Florida in 2011-2012. He was prosecuted in the Middle District of Florida and sentenced to 40 years in prison. Critically, the defendant is saying, This was who I was following in 2009.

"...but the first day I came to the states I found that the disbelievers imprisoned him." He is radicalized when he enters the United States. Those are his own words. There's no way to walk back from that. We know that for an objective fact.

So, Your Honor, I bring these communications from the defendant to the Court's attention to address

the 3553(a) factors, seriousness of the offense, just punishment, respect for the law, public safety. These are paramount concerns in this case.

It is very difficult for the government. Hopefully, the Court understands that in other cases where the government stands before you, we look for mitigation. We look for efforts to draw out issues in a case to make the sentencing individualized. With respect to this case, Your Honor, the expressed and demonstrated conduct of this defendant overwhelms any type of mitigation that can be found in this case.

With respect to the mitigation -- and I understand Mr. Durkin's position paper -- the mitigation is going to resolve to two issues: One, traumatic childhood with abuse, physical and otherwise, more aggravated abuse; secondly, that he is sure to face deportation. Therefore, the Court should express a judgment through that and give him a lenient sentence.

On the second point first, the government's position is that any potential future deportation action is purely a collateral matter. We fail to see how deportation is addressed in any of the 3553(a) factors. It would be a perversity to suggest that something that is speculative, what might happen in the

future. Well, Judge, he's certainly going to be deported but then he seeks somehow asylum or something or the country doesn't take him back, which is a very real possibility -- it would be a perversity to say a lesser sentence because of deportation -- deportation doesn't happen. Therefore, he just resulted in a lower sentence which can't be later corrected. So, Your Honor, the deportation argument is wrong, I would submit, as a matter of fact. It's wrong as a matter of law.

With respect to the troubled childhood, that's always a difficult issue. You know, there are thousands, if not tens of thousands, of people who have difficult childhoods. It appears that the defendant falls within that category. However, Your Honor, I would caution the Court that if we draw a causal connection between a bad childhood and engaging in acts of terrorism and espousing violent terrorists over the course of 18 to 24 to 48 months, that we are on a path where we do not want to go. That does a disservice to the tens of thousands of people who suffer from abuse, who do it quietly, who work through their issues, and who never commit a crime, let alone an act of terrorism.

It would be an unfortunate circumstance if

the driving factor in a serious crime of violence, in a crime of terrorism that is generational in nature -- these are crimes. In our papers, Your Honor, we said this is a unique brand of criminality. We stand behind that. Acts of terrorism are different than any other type of crime that we, frankly, have seen in our history. They're not robberies. They're not mortgage fraud. They are different. They are part and parcel of a larger context, a worldwide phenomena that has real ramifications within the United States. So, Your Honor, we reject, unfortunately, the argument that a bad childhood and trauma, therefore, should drive the Court's sentence below a sufficient level as the statute commands.

Not to be overly critical of the doctor's report, Your Honor, but -- I guess I will be overly critical. It's not much of a report. There's not a lot of science in here. I would draw your attention to page 11 of Mr. Durkin's position paper where he quotes from the psychologist: "Mr. Elhassan's depression worsened to its deepest lows, and he was overwhelmed with sadness, ruminations, and anxiety. His daily routine after breaking up with the woman in September 2015 involved staying at home and working occasionally. He developed severe sleep difficulties, not falling

asleep until 3 - 4 AM and then awakening in the mid-afternoon but not feeling rested."

Your Honor, this isn't medicine. That's not science. That is reflecting, regurgitating what the defendant is telling the doctor under the guise of -- Your Honor, a college student with a thesaurus could have written large parts of this report. I would ask the Court to give very little significance to the doctor's report.

The doctor's report is also flawed in two significant respects and the conclusion. The doctor says that this was -- again, he adopts the statement of his client, the defendant, and he says, "He's expressed to me that this was an impulsive crime." The doctor, I would submit to the Court, explicitly adopts that conclusion. That demonstrates complete lack of understanding of this report. This doctor did not know this case. This was not an impulsive crime, not in the least. This is a crime that took place in his mind before he started acting out with Mr. Farrokh, again, for 18, 24, and 48 months. So it's not an impulsive crime.

Then, lastly, he says in his conclusion that incarceration will provide him no services, again, not based on any fact, not based on any examination of BOP.

BOP, in fact, does have services to provide for incarcerated defendants.

So, Your Honor, we submit that this case is paramountly driven by public safety and seriousness of the offense.

We address the guidelines quite a lot in our paper. I would submit to the Court the guidelines in this case are restricted at 336 months. That is a long sentence. As the Court knows from our submission, we are not necessarily -- we're not asking for a 336-month sentence, a 28-year sentence. We agree that that's a difficult case to make under the 3553(a) factors. It would be disparaged from other cases. We are in agreement with that.

However, Your Honor, the sentence in this case does have to be compatible with the guidelines in a reasonable way. *Gall* and *Kimbrough* both tell us -- the courts and prosecutors and Mr. Durkin -- that a driving force behind sentencing is substantive reasons. *Gall* and *Kimbrough* both discuss maintaining some consistency with the guidelines. For instance, the greater the variance, the greater the necessity, the greater the factual record used.

Again, Your Honor, in this case, with the fact that he immigrated from Sudan by way of Egypt and

arrived here lawfully June 1, 2012. He arrived here lawfully to join his family. But he was radicalized when he entered and in a short period of time engaged in an escalating pattern of conduct that was not consistent with the public safety interests of this country. So, Your Honor, we do feel that a substantial sentence is warranted in this case.

Your Honor, if I could be so bold to talk about the departure issue just once more. For example, just by way of argument, if the Court were to consider a 188-month sentence, that sentence would be 148 months below the restricted guideline range, 12-plus years below the low end.

On these facts, individualizing this analysis to this defendant and this conduct here, frankly, respectfully, the government doesn't see how that sentence would be a sufficient sentence, sufficient, but not greater than necessary, to satisfy the seriousness of the offense, the public safety, and just punishment balancing the safety of the community versus the liberty interests of the defendant. That's a just punishment. In this case, the safety interests are up here. The liberty interests, at best, don't move. So the safety interests outweigh the liberty interests in this case.

So I offer that by way of argument. Again, respectfully, Your Honor, that would be a significant departure from the restricted guideline range, and even that number is difficult to justify under the 3553(a) factors.

So, Your Honor, with that in mind, I'm happy to answer any questions the Court has. Otherwise, we ask the Court to impose a substantial sentence in this matter reflective of the serious conduct, reflective of the danger of the public interest and public safety in this case. We would also ask the Court when you fashion a sentence to impose a lifetime term of supervised release.

THE COURT: Mr. Durkin.

MR. DURKIN: I'm almost not sure where to even begin because I think we have such disparate understandings of the sentencing process and what the government described to us in their pleading as the rule of law. I want to get to that if I could.

But before I get lost in my own argument, I wanted to introduce to the Court -- Dr. Stephen Xenakis is here. I did not intend to call him, but he is willing to stand by his report.

THE COURT: I've read his report.

MR. DURKIN: If you have any questions for

him, he's happy to answer them, particularly in light of the comments of the government. He is, after all, a former brigadier general from the Army.

THE COURT: I'm well aware of Dr. Xenakis' qualifications.

MR. DURKIN: Okay. I take serious issue with Mr. Fitzpatrick's comments that that report could have been written by a sophomore in college. I'll discuss that later.

There's also a number of family that are here, some of whom have already written letters. If I could just introduce them.

THE COURT: Yes.

MR. DURKIN: His sister, Reem Elhassan, is here. Sitting next to her is her sister, Doha. There's also two brothers here. Ehab is here and Eltoun. There's also a cousin here by the name of Elmotaz Fager, and there are five family friends. If I could simply identify them: Waleed Taha, Ali Alshayer, Michael Robertson, and Mohamed Elburji. I meant four family friends. Then the secretary of the embassy of the Sudan is here.

THE COURT: Thank you.

MR. DURKIN: When I received Mr. Fitzpatrick's pleading, I was tempted to react as

an angry Irishman, which I used to do a lot more when I was younger. I've tried to stop doing that in my old age. I was subdued by Mr. Sears, who told me that it's pretty much what he would have expected, that it was pretty much the same pleading that was filed in the codefendant's case. I calmed down.

But I didn't file anything because I thought our paper was pretty thorough. I certainly respected your thoroughness and willingness to read our side of this.

I do want to talk about the one thing. He didn't mention the rule of law once here, but he talked about in his papers the rule of law. I'm afraid that we have a substantial disagreement between the rule of law. Because in his pleading, he said -- this is towards the end of page 20 -- "A lengthy sentence recommended by the Guidelines would send an appropriate message to the public that we are guided by the rule of law."

He also says, much like he said earlier today, "The importance of this factor cannot be overstated. A substantial sentence in this case would send an appropriate and much needed message to all persons harboring any notion that serving, joining or aiding the Islamic State in any manner is worthwhile."

I want to emphasize the "in any manner" because I'm going to refer to that in a minute.

"It is abhorrent conduct. Strong punishments for this conduct send the appropriate message to others, i.e., that providing support to terrorist organizations will be pursued aggressively, and those who violate the law in this manner will be tried, convicted, and punished accordingly."

Then he concludes by saying, "In a free" -- I shouldn't say he. I mean the government. "In a free, open, and vibrant democracy, tough sentences for violent crimes achieve justice by allowing the people to live freely without fear, violence and intolerance. Fidelity to the rule of law, and respect for the law, is a hallmark of American democracy."

Mr. Fitzpatrick made reference to this again at the end of his remarks. If I wrote it down correctly, he said, "One of the issues you should consider is balancing the safety of the community versus the liberty interests of the defendant." I couldn't disagree more with that statement vis-a-vis sentencing. That argument taken to its logical extreme would prolong detention as some type of prognosticator for potential violence.

He made reference in his comments to his

crime began in his mind, which is exactly the point of the mitigation in this case, which I think is substantial. But that's a dangerous slope to go down.

One of the things the government argues in these cases -- and I've heard it before -- is that this is a crime of terrorism and all sizes -- a terrorism case fits all sizes. It doesn't matter what the conduct is. That's the issue, I think, in this case. It's very significant, which is why we cited the Second Circuit's -- Judge Calabresi's opinion in the *Stewart* case in the Second Circuit. If you don't mind, I'd like to read it because I think it addresses just the opposite of what the government wants to argue is the rule of law.

Judge Calabresi in the *Stewart* case -- we quoted this on page 6 -- "When the terrorism enhancement is applied, it has dramatic consequences on the applicable Guidelines range because it automatically increases both the offense level of a crime and the defendant's Criminal History Category. In Stewart's case, for example, the recommended sentence range without the enhancement was 78 to 97 months, while the imposition of the enhancement resulted in a recommended sentence of 360 months, the statutory maximum," which is even higher than in this

case.

"When a Guidelines recommendation" -- this is the point where the government and I dramatically part company, and I join Judge Calabresi. "When a Guidelines recommendation has such dramatic consequences and yet covers a multitude of sins" -- we're back again to Mr. One Size Fits All and the comment here about the type of crime this was and it began in his mind -- "unusually broad sentencing discretion in the district court is essential. Indeed, it must be so to comply with the Supreme Court's remedial holding in *United States v. Booker*."

I make a sharp distinction here, and I take great offense with the idea that somehow we should revert back in terrorism cases to some type of mandatory guidelines imposition -- unless you can come up with reasons because of the nature of this offense -- exactly for the reason Judge Calabresi says, because it is a one-size-fits-all situation.

This enhancement covers a wide variety of a multitude of sins. What he has pled guilty to here and which he is guilty of is aiding and abetting the flight of Mr. Farrokh. You already sentenced him. So I think that's a serious factor to take into account with regard to disparity under 3553(a). You already did go

down, and I hope you would do the same here for the same consistency.

But the reason that's important is that *Booker* made the guidelines unconstitutional. If the government is suggesting -- which I think they are -- that we should go back to mandatory guidelines for public safety, then I disagree that they have any allegiance to the rule of law. Because the rule of law is, one, founded on the Constitution first and foremost. The Constitution doesn't permit blanket assertions of sentencing authority like that from the guidelines.

To go back to that would be a step -- a terrible step in the wrong direction in the interest of public safety. It's another state of emergency. We have an emergency going on. The government commented in their pleadings that a number of judges are going way below the guidelines.

I would think that the hallmark of American democracy is an independent judiciary that has discretion. That's what the government should be arguing to you here, in my opinion, if they want to be faithful to what I consider the rule of law to be, which is, first, the Constitution and *Booker*.

Secondly, everything we've addressed in all

of the mitigating factors here is based on either the statute, the guidelines themselves, or 3553(a). Everything we said could be factored -- and we tried very hard to put all our arguments into those particular categories.

The government makes light of our deportation argument, and I believe that is properly considered under Section 3553(a)(2)(A) to (C), which we mention in our pleadings. There's no question in my mind, and we cited a case from --

Is it New Mexico?

MS. WATERS: Yes.

MR. DURKIN: There's also a Fourth Circuit case that I would also cite, *United States v. Debeir*, D-E-B-E-I-R, a July 29, 1999, case that talked about -- and this is when the guidelines were mandatory -- downward departures for the impact that deportation would have under conditions of confinement. There's no question that's what's going to happen here. He's not going to get all of that.

More importantly, as to the severity of punishment, there is no question in my mind that he is going to be deported.

I forgot to introduce Thomas Ragland who is also available for your questions, if you want.

Mr. Ragland is the deportation attorney for Mr. Elhassan and the family that we have consulted with, and everything in our pleading concerning the immigration consequences are based on his opinion. Mr. Ragland is a very experienced Washington immigration attorney who has appeared in this court a number of times. I don't know if he's appeared before you, but he's appeared in this district quite a bit.

I think our predictions are quite accurate, and I'll stand by that. So I don't think the argument that somehow maybe he's going to hit the jackpot and get a reduction and then never get deported is going to be the case. As I said in my pleading, he would opt for that if he could. Trust me.

He has not been to the Sudan since he was nine years old. For him to leave his family, which is going to happen, and go back to the Sudan is a sentence far worse than incarceration. As I said in our pleading, if he had the choice, he would opt for a longer period of incarceration if he could stay in this country. It's not going to happen. I think that's a factor you can take into account under 3553(a)(2)(A) through (C).

In our pleading, we pointed out -- I mean, Your Honor, one is Dr. Xenakis' report because, I

think, it's critical for the recommendation we are making. The point of Dr. Xenakis' report is what he was undergoing mentally, emotionally, and physically at the time of this offense when he gets here. That is not only borne out of Dr. Xenakis' report, it's borne out in our papers with respect to -- and the probation report, which was quite well done I might add.

The trauma that this young man has suffered is greater than any that I have had in the 42 years I've been practicing law in one level in such a short period of time. He has the issue of the abuse in the Sudan when he was young. His mother has to flee the Sudan to take him to Egypt to get away from it.

He goes to Egypt, and his mother has to go to the United States to get diagnosed for this hereditary kidney condition and the cystic fibrosis that she suffered from. He's left in Egypt with the two younger children at age 18, I believe. He left the Sudan at 9. Nine years later he's left in charge of two children while his mother goes to the U.S. and is diagnosed and seriously ill.

The mother ultimately comes in 2014, and no sooner does she get here, then she dies. I believe it's like a six-month period. We've outlined it in our papers. I could be off a month or two. This is

happening to him.

At the time of this conduct, the government makes a great point to point out that he was having these thought crimes in 2013. Now, obviously, is that something you can take into account? Certainly. I'm not going to ignore, nor can I ignore, nor would I that where he was at in his head at that time was a very bad place.

We pointed out to you -- the government makes no reference to anything we've cited. We pointed out a report from the Forham Law School on page 13 of our pleading that sets out that these cases, particularly the ISIS cases, are frequently caused by identity crisis and alienation from society across a wide range of the ISIS cases. That report is excellent, and it's well worth considering because it shows the kind of influence that can happen.

We cited to Mr. Peter Bergen's testimony before Congress where he talks about people in these types of cases frequently want to do something of cosmic proportion. That's a question of identity that we're seeing in these types of cases, which I submit is one of the very good reasons that a number of judges, yourself included, have seen fit to reduce cases well below the guidelines with the horrific impact of the

terrorism enhancement.

These are crimes directed at the youth, and he was young. But this was an unusually different young wan who was under incredible, incredible personal and emotional toil. We listed them out for you. I don't want to belabor it. But after his mother dies in September 2014 --

Again, this is during the time this conduct is going on supposedly, the government says but we don't dispute. But I dispute the nature of how you might describe the conduct. It's one thing to say something. It's another thing to do something. It's pretty clear he didn't do anything. It's a slippery slope to start worrying about what somebody might have been thinking and maybe could have done but didn't do.

In February 2015 -- I'm sorry. In November, his sister, Reem, who was then the matriarch of the family, leaves the family home. Again, he's left in charge.

In February 2015, Reem begins dialysis. So she is out of the family picture again. She has a huge health issue. In the spring of 2015, his younger sister, Doha -- and I don't want to embarrass her, but I think what happened to her with the suicide attempt while she was under the care of her brother was

incredibly traumatic on the whole family but, most importantly, on Mr. Elhassan who felt responsible.

As we pointed out, that was also one of the things that his mother had criticized him for while he was raising her in Egypt, that she was becoming deviant. In other words, she was becoming westernized, and that was before they got here. But the rift in the family was over Doha becoming more westernized.

I don't know. I grew up in an Irish Catholic family on the south side of Chicago. Suffice to say, there were strong differences of religious opinion in my household after I started going to college. I have some understanding of conflict in homes over attitudes of religion and things like the Vietnam War and all kinds of other things, which we don't need to belabor either. The point is that's a huge, huge emotional issue going on that resulted in the depression.

Then in the spring of 2015, after the suicide, he leaves town, goes to Philadelphia he's so disturbed.

In June of 2015, he himself is hospitalized for the kidney problems. Days later, after he's in the hospital and in June 2015, his sister gets a transplant kidney from one of her brothers. She's still suffering from that. It's a family issue that he is suffering

from.

But then, most importantly, from an emotional standpoint, which I think everyone has to identify with, is that in the one light he finds in his life, who is this Somali woman in Atlanta. It begins to put some type of meaning back into his life in August 2015. Again, right around the time we're talking about. He goes to Atlanta to ask for her hand in marriage, and he's rejected because he's Sudanese.

I don't even profess to understand what that's all about, but I -- you know, it was described in Dr. Xenakis' report as a perfect storm, and I think a perfect storm it was indeed. This is a perfect storm with emotional consequences that, I think, is more than we see in any of these cases.

Again, going to Dr. Xenakis' report -- and I do take umbrage at the criticism of it as -- maybe criticize Dr. Xenakis because he's not a board certified forensic psychiatrist, but he's a treating psychiatrist. To talk about it being sophomoric is a bit over the top.

I must be missing something because I read on page 7 of the report that he made three psychiatric medical diagnoses from the DSM-5. He makes his professional finding, 296.22, major depressive disorder

with anxious distress; 3.981, post-traumatic stress disorder; and 294.11, mild neurocognitive disorder due to traumatic brain injury, which, as you know, is the result of this accident that he had. I forgot about that.

Talking about a tale of -- he gets hit by a car when he's 14 years old in Egypt and is in the hospital for seven months, several of which were in a coma, which he's still suffering from. That's grounds for a variance unto itself, three psychiatric disorders, two physical disorders that he had diagnosed, chronic familial renal disease and musculoskeletal pain.

I think Dr. Xenakis' report is very thoughtful. I think it's genuine, and I think that it demonstrates the turmoil that would cause somebody with that much depression, anxiety, and crises going on in his life at the same time to want to turn to something that Mr. Bergen describes as something of a cosmic proportion. We see that.

You know, like President Obama said. You know, we have to somehow fight that type of ideology, and that's what it is. It is an ideology that is attractive if you don't have critical thinking skills. I made reference several times to his critical thinking

skills.

Mr. Fitzpatrick says but for the intervention of the FBI, he would have either gone to Syria or he would have become the Lone Wolf, which I don't believe he was or ever meant to be.

A third option I would posit is just as likely from the evidence is that a few days before he was going -- before he drove Mr. Farrokh to the airport, he had signed up, again, for a semester full of classes in northern Virginia.

I'll posit a third hypothetical to the government: Maybe had he gone to school -- this is not criticism of them not arresting him. I'm not blaming anybody. I get the government's obligation to have to do what they have to do on the war on terror. I get that. But we're talking about individualized sentencing. A third alternative could have been that he could have developed critical thinking skills.

We do have evidence -- and we submitted it to you -- that he is changed. I can tell you simply by having been his lawyer for so long he is not the same person that I met shortly after his arrest. He is a changed man in the 13 months he has been incarcerated, significantly. Dr. Xenakis comments on that. He's done everything he can in the institution, as those

certificates show, to better himself.

He wants help now. He realizes that in many ways -- and he's thankful that he was arrested on one level because had his mental condition not improved and had he done something, gone over seas like Mr. Farrokh wanted to do, God only knows. So he's lucky to be here now.

But that doesn't mean that we should just lock him up and throw the key away. That would be pointless. He's had a horrible, horrible life, and the idea of searching for some religious hope for a better life and the idea of trying to achieve something of cosmic proportion when you're that young is a troll that has gone on in mankind forever. It's understandable.

We're not asking for approval of any of his conduct. He's horribly ashamed. He does have something he'd like to tell you along those lines. But this is a kid who deserves a chance. He's had a terrible, terrible time, and he's mortified by the mental state that he found himself in and his inability to counter it. He believes he's making progress in that regard. His sessions with Dr. Xenakis have helped him in that regard.

I don't think he's going to get an enormous

amount of help in the Bureau of Prisons just because I think -- it's not criticism of the Bureau of Prisons, but I think it's just a money factor as to what is really available. But I can assure you and he can assure you he would take every possible effort he could get in the Bureau of Prisons.

I know there's been talk of what they call CVE, Countering Violent Extremism. Those programs haven't really gotten off the ground. I know for a fact they don't exist in the Bureau of Prisons because we had it come up in another case recently in Chicago where the issue was the conditions of supervised release. It was a condition of the supervised release that the client get Countering Violent Extremism counseling, but it's been very difficult to put together because it's not there.

There are three trial programs at the FBI and, I believe the Department of Justice is sponsoring in Boston, Minneapolis, and Los Angeles. They just began. They are trial programs. Nobody is quite sure where they're coming from, but it's in response to President Obama's comment that we needed to do something about this ISIS propaganda and so forth. It's a realization that it's an issue that needs to be addressed.

But what I think is critical here is the sound discretion of the judiciary and the ability to not reflexively want to impose a harsh sentence for the sake of satisfying the public and making them feel more safe and secure. That's not going to make the public more safe and secure.

The sentence we requested in the range of 47 to 71 months, which is what the guidelines would have been without the terrorism enhancement, as I said in our pleading, is not a lenient sentence in my opinion to a first offender.

I don't think the particular conduct should change that. Yes, it is serious conduct. It is a serious offense, and we don't dispute that. But the balancing is not a question of balancing safety of the public versus civil liberties. The balance is the discretion to provide an individualized sentence for a particular person in a particular case taking into account all of these factors. I, again, refer you to our pleading. I think it is very, very founded in the law. It's based on the guidelines.

I forgot to mention the specific reference we made in our pleading that the government did not address. The guidelines specifically provide U.S.S.G. § 5H1.3, that in mental and emotional

conditions -- it's a policy statement. If such conditions, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish this case from other cases, then it would be covered by a reduction.

I think that fits this circumstance particularly. This is an extremely unusual degree of what I would consider mental and emotional issues. They're well verified. They're documented by Dr. Xenakis, and he has made progress to improve it. He's not the same person now. That doesn't mean he shouldn't be punished. He will be punished. He already has been punished.

Again, not to belabor to sound like a broken record, the bigger punishment will be having to go back to the Sudan where he's not been since he was nine years old. I think that's a factor you can justifiably take into account.

As I concluded in our papers, as I think is appropriate, justice tempered by mercy would be appropriate here.

Thank you.

THE COURT: Thank you.

MR. FITZPATRICK: Your Honor, can I just address two quick points, please?

THE COURT: Yes.

MR. FITZPATRICK: It won't take long.

THE COURT: I'll let you respond, Mr. Durkin.

MR. FITZPATRICK: Mr. Durkin raises the issue that -- he makes the allegation that the government takes a one-size-fits-all approach to sentencing. This Court knows to a moral certainty that this prosecutor does not take a one-size-fits-all approach.

I believe I had the *Leon Traille* case with Your Honor. The government acted very reasonably in that case. Why it's pertinent to today's proceedings, Your Honor, Leon Traille had a mental illness that caused him his crimes. There was a causal relationship between his mental illness and the crimes that he committed. That causal relationship does not exist in this case, and it does a grave disservice to aspects of mental health and mentally ill people to suggest otherwise.

We did not make the argument, as Mr. Durkin said, that we are treating this as a mandatory guidelines case. Nothing could be further from the truth. We don't say it in our papers, and in the first five minutes of speaking with Your Honor, I told you that.

THE COURT: I understand.

MR. FITZPATRICK: So we don't treat this as a mandatory guideline provision.

The last thing is the suggestion that Mr. Elhassan sought out this violent ideology in the hopes of getting some religious hope is false. He sought it out because it's a violent ideology divorced from any religious hope or prospect.

THE COURT: Mr. Durkin, I'll give you an opportunity to respond to anything you would like. Don't feel compelled to do it. I'll give you that opportunity.

MR. DURKIN: I thought it was a government pleading. I wasn't trying to impugn the integrity of Mr. Fitzpatrick.

THE COURT: I understand.

MR. DURKIN: Maybe all Irishmen get combative. I don't know. I guess. He's younger than I am.

I can't say any more than I've already said.

THE COURT: All right. Thank you.

Mr. Elhassan, you have the opportunity to address the Court if you'd like to say anything, sir, before sentencing.

THE DEFENDANT: Thank you, Your Honor. First off, if you allow me, I'd like to speak as a human

being.

Since the age of nine years old, I've been going through a lot. I used to look at myself as -- I used to look down upon myself. I used to feel that I was worthless for the reasons that the Court is aware of. When I grew up, I was just in that mind of -- a state that I didn't know -- I was just feeling I was half a man. I felt like I was incomplete.

So when I came to America -- first of all, I'd like to thank America for allowing me to join my family and -- but then I was just kind of isolated. Even when I was in Egypt, I was isolated. I barely had friends due to depression that I used to have. And just as growing up -- when I came here to the United States, I was just exposed to all of this. I thought that was -- in my opinion, I thought that was some kind of fulfillment that -- a part that I was missing, which was seeking the other half of being a complete man. So as you can see or as the prosecutor said, it was -- it just -- all the stuff that I was saying made me feel like I was seeking to be a full man.

I mean, I admit to everything that I had said, but that was in the past. I have bypassed that point. I renounced everything that I was saying because I came to the conclusion that I really had a

problem, and I was afraid to confront that problem.

Now the facility that I've been detained in for the months has offered me the ability to sit down with myself and offered me some psychological help. I've been enrolled in this program called mental health for over two months now. It's really helping me.

If Your Honor would allow me, I would like to apologize to my family. I'd like to tell them I'm very sorry for everything, for everything I have brought upon them, all the shame.

I'd also like to apologize to the Muslim community for just defaming their image.

I'd like also to apologize to my neighbors, the good people that I was living around. I'd like to apologize to them.

And I'd like also to apologize to the American society in general.

The reason why I didn't send a letter to the Court is just because I want to apologize in front of everyone. I want to tell everybody that I'm sorry not only once but a thousand times. I wish I could go back. I wish I could turn back time.

I could've -- and I wish all the depression and all the stuff that I was going through -- my sister tried to commit suicide. My mother passed away. I

used to take care of my sister who was going through dialysis. I was taking my little brother, who donated his kidney to the hospital, to be for severe pain. I was just --

I wish my mother was alive. She was the only semblance of peace in my life. I wish she was there. She could have helped me a lot. But since I came to America, her health was deteriorating. She was just -- she was going from a bad stage to another until all of a sudden, she passed away. And I was just left all there by myself in my basement.

I wish I could have sought some type of help, some mental health, you know. But it was just I came from a different environment where these things are not considered to be helpful, talking to a psychiatrist or talking to a doctor is not really helpful.

So I really thank the Court. I thank Your Honor for giving me the chance to speak. Thank you so much.

THE COURT: All right. Have a seat.

This matter is before the Court for sentencing in the case of *United States v. Mahmoud Amin Mohamed Elhassan* who has been convicted of attempting to provide material support to a foreign terrorist organization, aiding and abetting, in violation of

Title 18, United States Code, Section 2339B, which is a Class C felony punishable by a term of imprisonment up to 20 years, a fine of up to $250,000, a life term of supervised release, and a $100 special assessment; also, Count 3 of false statements, in violation of Title 18, United States Code, Section 101, which is a Class D felony punishable up to 8 years in prison, a $250,000 fine, up to a 3-year term of supervised release, and a $100 special assessment.

This 26-year-old defendant was involved in assisting Codefendant Joseph Hassan Farrokh to join the Islamic State and to travel to Syria for that purpose and also providing false statements to the FBI in connection with his terrorism-related activities.

The defendant was arrested on January 16, 2016, and on May 26, 2016, a three-count indictment was issued charging him with conspiracy to provide material support to a foreign terrorist organization, attempting to provide that material support through aiding and abetting, and also false statements to the FBI.

On October 24, the defendant entered a plea of guilty as to Counts 2 and 3 without an agreed upon statement of facts or formal plea agreement with the government. He's been in custody since his arrest.

The Court has reviewed the guideline sentence

that has been proposed in this case, as well as the defendant's objections.

I understand the defendant no longer objects; although, they raised it in their papers as to a mitigating role reduction. The defendant does object, however, to certain conduct listed in the presentence report as not being relevant conduct on page 11, paragraph 45.

The Court has reviewed that information. It is properly identified as conduct that is not relevant to the offenses of conviction or dismissed counts. The Court has not considered it with the overall sentence to be imposed in this case, but it is background information relating to the defendant's personal history and characteristics. Therefore, it is properly included in the presentence report. So the objection is overruled.

Most importantly, the defendant objects to the criminal history VI that's been assigned to this defendant under the guidelines on the grounds that it overstates the defendant's criminal history and requests that his guideline sentence be calculated based on a criminal history I, which would apply absent the terrorism enhancement under Section 3A1.4(b).

Under the guidelines and the relevant

commentary, the Court concludes that the terrorism enhancement is properly applied in this case and specifically finds, based on the facts set forth in the presentence report and the plea colloquy that took place in this case, that through his conduct, the defendant intended to influence or affect the government by intimidation or coercion or to retaliate against government conduct.

The enhancement is further endorsed under Application Note 3, which advises that an offense that involves obstructing an investigation into a federal crime of terrorism shall be considered to have involved or intended to promote that federal crime of terrorism. Here the defendant was not charged or convicted of an obstruction offense as such, but he was convicted of providing false statements to the FBI in connection with their investigation into his activities and had a similar effect.

Also, given the facts to be discussed concerning the defendant's role in this case and his other terrorism-related activities, the Court overrules the defendant's objection that criminal history VI overstates the seriousness of the criminal history as that determination is to be made under the guidelines. In it's commentary, however, the Court will consider

the defendant's positions and arguments in connection with a variance from the guideline sentence.

Fourth, the defendant seeks a downward departure under the guidelines based on, first, the likelihood of deportation at the conclusion of the custodial sentence; secondly, significant family ties and a disadvantaged childhood; third, a history of abuse; fourth, psychological harm, trauma from the loss of his mother; and, fifth, serious ongoing medical issues.

Based on the guidelines and the relevant commentary, none of these considerations qualify for a departure under the guidelines or their commentary for the purposes of calculating the guideline sentence. Although, again, the Court will consider these factors in connection with a possible variance from the guideline sentence.

Based on these rulings, the Court calculates the guideline sentence as follows: The base level is 26. The base level is increased by 12 under Section 3A1.4(a), the terrorism enhancement. It's increased appropriately again by an additional 2 levels for obstruction of justice resulting in an offense level of 40. The defendant has accepted responsibility; therefore, a 2-level reduction is

appropriate. Based on that acceptance, the government has also moved for an additional 1 level, which the Court grants, resulting in an overall offense level of 37.

Based on the terrorism enhancement, the defendant's calculated sentence is based on a criminal history VI. The resulting guideline sentence is 36 [sic] months to life, which is capped at 28 years on the combined counts pursuant to statute. Probation is not authorized under the guidelines; although, it is under the statutory provisions. Supervised release is recommended on both counts at 1 year to life with a fine of $40,000 to $400,000 with special assessments of $100 as to both counts.

(Discussion off the record.)

THE COURT: The guideline sentence range is 360 months to life, not 36.

The Court has also considered the sentencing factors under 3553. In that regard, the defendant pled guilty without an agreed upon statement of facts or a plea agreement. Nevertheless, the Court has considered these factors based on the facts as they appear in the defendant's statements under oath concerning his conduct during the plea colloquy. Also, the Court will proceed in light of the facts in the presentence report

that have not been objected to and which the Court will accept as accurate in its findings of fact as authorized under Rule 32(i)(3).

As far as his background, the defendant was born in Sudan. He came to the United States in 2012 when his mother, who had already relocated here, was able to obtain a permanent resident card for him and his siblings. Once in the United States, he found intermittent employment. He has no prior criminal history.

As to the background of this case, in 2012 the FBI began working with a person referred to as Cooperator 1, who had been convicted of offenses related to threatening communications and conspiracy. Cooperator 1 had been operating Internet platforms and Web sites containing postings, including videos, supportive of violent jihad and was in direct and regular contact with numerous Islamic extremists who espoused violence against those they thought insulted Islam or were what they call "disbelievers" and whom Cooperator 1 allowed to post on his platforms.

The defendant contacted Cooperator 1 while that person was in prison in order to learn how to support the Islamic State, and Cooperator 1 arranged for the defendant to connect with an individual

reportedly aligned with the Islamic State.

The defendant had been using various Internet sites, such as Facebook, Twitter, and Google, to support and espouse violent jihad since shortly after his arrival in the United States in 2012 and posted on his Facebook his affiliations and allegiance with Islamic extremist groups.

For example, in 2014, he posted a Facebook posting profile picture of himself with a black jihad flag associated with Islamic extremist groups and videos supporting terrorism and comments concerning his desire to work with Cooperator 1, who was then in prison.

The defendant became friends with the codefendant in this case, Joseph Farrokh, who was then a 28-year-old northern Virginia resident who was interested in traveling to Syria to fight with the Islamic State. The defendant told Farrokh about a known radical Sudanese cleric who supported the Islamic State and stated he was in direct contact with that cleric. He proposed to Farrokh that the two of them communicate about Farrokh's attempt to travel to Syria using an app that was purported to be safe from law enforcement detection. The pair later communicated with someone overseas. They frequently met in person

to discuss the Islamic State and their plans to join the Islamic State in Syria.

When Cooperator 1 was released from prison in the middle of 2015, the defendant introduced him to Farrokh for the purposes of facilitating his travel to the Islamic State. He also engaged in various conversations over time with Cooperator 1, including discussions about specific ISIL or ISIS members and whether various individuals could be trusted.

Throughout the fall of 2015, the defendant and Farrokh discussed Farrokh's travel plans. The defendant coordinated with Cooperator 1 for that purpose. He also discussed with Cooperator 1 the possibility of providing other assistance to another individual associated with the Islamic State.

In early January 2016, the defendant met with someone he was introduced to as a person assisting the Islamic State members with technology needs, including computers that use the latest technology and graphics, during which meeting the defendant received $5,000 for the purchase of such computers.

Then on January 15, 2016, the defendant drove Farrokh in his taxicab from his home in Woodbridge to near the Richmond Airport, from which Farrokh then took a cab to the airport itself. During the trip and

earlier, the defendant had assured Farrokh that he would follow him, and Farrokh had already given the defendant money for that purpose.

Later that day, the defendant was interviewed by FBI agents, during which he lied concerning his own support of ISIS, Farrokh's support for ISIS, his relationship with Farrokh, and the details concerning Farrokh's travels. He was arrested at the end of that interview.

Against this background, the Court has considered the guideline sentence and the extent to which it reflects an appropriate sentence with respect to the sentencing objectives.

The guideline sentence is driven by the terrorism enhancement, which increases the guideline sentence beyond the statutory maximum of either count by application of Section 5G1.2, which advises that sentences on multiple counts should run consecutively in order to reach the guideline sentence. The Court has considered whether such a sentence is necessary to achieve the sentencing objectives. The Court understands the government's position that they're not asking for that total guideline sentence.

The Court is focused on where within the range of conduct punishable by a 20-year statute this

defendant's conduct would fall. For that reason, the guidelines given the terrorism enhancement, which really essentially results in essentially close to a life sentence with respect to any conduct that would be prosecutable under the material aid statute, is less than completely useful in guiding the Court as far as what an appropriate sentence is in this case.

So the Court has focused on the conduct, the substance of this conduct, and how that would relate to the range of conduct punishable under the statute. In that regard, the Court has considered centrally what sentence is necessary to adequately protect the public from this particular defendant, as well as for general and specific deterrence. For that purpose, the Court has considered a wide range of factors, including the defendant's disposition for actually engaging in terrorism, his past intentions, and his future dangerousness in that regard.

As always, these assessments are not easy, and the Court must look not only to his actual conduct but his declared intentions. For that reason, the Court has considered his activities to enlist, recruit, and radicalize others, his declared intentions and objectives before his arrest, the context within which those statements were made, his overall commitment to

the radical terrorist philosophy that caused him to engage in this offense, and the extent of his acceptance of responsibility.

Here the defendant had made clear his commitment to violent jihad. For over two years before his arrest, he posted under a pseudonym statements that advocated his commitment to violent jihad and also his intentions to establish himself as what you call a sleeper cell here in the United States and act as what he called the Lone Wolf. Even discounting such statements to the possibility of youthful privado, the defendant demonstrated his mental state committing to terrorism through his statements and also his self-touted contacts with radical clerics and his recruiting and facilitating efforts of others, including Farrokh, who he encouraged and assisted in his travel plans to join ISIS with promises to join him there.

The Court has also considered the information it's received with respect to his family history, the physical and mental health issues that are associated with that history, the thorough report of Dr. Xenakis, which the Court has found very helpful.

The Court has considered the reasons and experiences that the defendant has put forward as

reasons that may have motivated his conduct. The Court has considered those. But the Court has also considered that as searing and motivating as some of those experiences may have been, the Court is obligated to consider the defendant's conduct and what may have been the consequences of those experiences.

The Court has also considered the defendant's age, his age upon release under any particular sentence, the need for rehabilitative services.

The Court has also considered the many letters from his family and friends concerning his good nature and good qualities, and the Court has considered his family ties and the beneficial influence those ties can have over time.

The Court has also considered that the defendant may be deported following his term of incarceration and, therefore, has considered the extent to which the defendant may continue to pose a threat to the United States after his deportation, as well as whether and to what extent supervised release can substitute for active incarceration with respect to the sentencing objectives.

The Court has also considered the need to avoid unwarranted sentencing disparities and, in particular, how this defendant's level of culpability

compares to that of Mr. Farrokh who has already been sentenced.

Based on all of the information, the Court is in a position to impose sentence at this time.

Mr. Elhassan, would you come to the podium, please.

With respect to Count 2, it will be the sentence of the Court you be committed to the Bureau of Prisons for a period of 132 months, following which you'll be placed on 10 years of supervised release. With respect to Count 3, the Court imposes a sentence of 96 months to be served concurrently with Count 2, followed by 3 years of supervised release to be served concurrent with supervised release under Count 2.

The Court will impose a $200 special assessment, $100 for each count. The Court will not impose a fine.

The Court will recommend that you be placed in a facility, if available and appropriate, within the Metropolitan area to facilitate visits with your family.

Is there anything further?

MR. FITZPATRICK: Your Honor, I have an order to dismiss Count 1.

THE COURT: All right. The Court has entered

an order of dismissal with respect to Count 1 of the indictment.

Anything further, Mr. Fitzpatrick?

MR. FITZPATRICK: No, sir. Thank you.

THE COURT: Mr. Durkin, anything further?

MR. DURKIN: No, Judge.

THE COURT: All right. Counsel is excused. The defendant is remanded.

The Court will take a brief recess before the civil docket.

----------------------------------
Time: 11:14 a.m.

I certify that the foregoing is a true and accurate transcription of my stenographic notes.

/s/
Rhonda F. Montgomery, CCR, RPR