**IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA**

**Alexandria Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| v. | ) | **Crim. No: 1:16-CR-064** |
| **MAHMOUD AMIN MOHAMED ELHASSAN,** | ) | |
| Defendant. | ) | |

**UNITED STATES RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE**

In light of the novel coronavirus and the COVID-19 pandemic, the defendant seeks early termination of his prison term under the compassionate release provision in 18 U.S.C. § 3582(c)(1)(A)(i). The defendant, Mahmoud Amin Mohamed Elhassan (hereafter "defendant"), has been convicted of attempting to provide material support to a foreign terrorist organization, in violation of 18 U.S.C. § 2339B, and making false statements, in violation of 18 U.S.C. § 1001.

The defendant was committed to the Islamic State (ISIS) and its perversely violent ways. PSR ¶ 8-27; *see also* ECF No. 55, Exhibit A-F. He characterized himself as a "sleeper cell" or "lone wolf." ECF No. 55, Exhibit B-C. The defendant sought contact with individuals aligned with ISIS. PSR ¶ 11. The defendant operated as a recruiter. *Id* at 19. After an associate named Joseph Farrokh expressed impatience and wanted to immediately leave Northern Virginia to "chop their heads," the defendant embarked on a mission to assist Farrokh in achieving their mutual goals. *Id* ¶ 16-26. But for the intervention of law enforcement, the defendant's commitment to ISIS may have proven much darker—and deadlier. Yet when the defendant was ultimately confronted by the FBI, he lied. *Id* ¶ 28. And he kept lying. *Id*.

Now, the defendant argues that he is entitled to compassionate release based on outdated information from FCI Danbury, where he is incarcerated, that fails to reflect the fact that only 23 out of 899 inmates currently test positive for COVID-19. ECF No. 64. He conflates his reported family medical history and his own medical concerns in a misleading attempt to convey a dire prognosis of imminent "kidney failure" despite no definitive evidence. *Id* at 5. Moreover, the defendant offers contradictory assertions about what, exactly, his plans are should he be released. For example, a footnote to his motion references a generally unenforceable "willing[ness] to forgo any objections he might have to his removal from the country" as an incentive for release. *Id*, fn 2. Yet in the same filing, the defendant touts his "extremely loving and supportive family who would gladly welcome him back into the family home in Woodbridge, Virginia." *Id* at 28. As such, we are only left with the word of a convicted ISIS supporter whose convictions include making false statements.

Despite this, in a good faith effort to determine how it wished to proceed, the United States reviewed, among other items, the defendant's medical condition, the current positivity rate at FCI Danbury, and the feasibility—based on the defendant's representations—of achieving relative certainty that the defendant would ultimately be deported should this Court grant release. ECF 70. Along with that information, the United States also weighed the potential risks should the defendant be granted compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A)(i).

The risk is simply much too great. The defendant engaged in terrorist activity that was inherently global in nature. He lied to federal agents, demonstrating a lack of trustworthiness. The defendant used various internet and social media sites to support and espouse violence. PSR ¶ 11. Through it all, he demonstrated a propensity for attempting to obfuscate his intentions. *Id* ¶ 12. Accordingly, the Court should deny the defendant's motion. Using compassionate release

in the defendant's case would fail to address a range of important practical and legal problems and would not satisfy the standards in § 3582(c)(1)(A).

**<u>BACKGROUND AND RESULTS OF THE UNITED STATES' DUE DILIGENCE</u>**

**A. <u>Defendant's support for ISIS</u>**

ISIS is a barbaric terrorist organization committed to the slaughter of the *kuffa* (non-Muslims). PSR ¶ 18. The defendant committed himself to supporting ISIS as the following facts detail.

The defendant arrived in the United States on or about June 1, 2012, after his mother obtained a U.S. permanent resident card on his behalf. ECF No. 55, at 4. The defendant's mother, who has since passed away, was originally from Sudan, but moved her family to Egypt when the defendant was a child. *Id*. The defendant was 22 when he entered the United States. The defendant was 25 when he was arrested for these offenses. *Id* at 5.

The defendant was radicalized toward violent jihad either before he arrived in the United States or shortly after arriving in the United States.[1] The defendant used various internet and social media sites to support and espouse violent jihad. PSR ¶ 11. He publicly expressed in graphic terms his support for violent jihad. *Id*. The defendant did not just talk the part of a violent radical, he acted upon it as well. For example, he sought out an individual, who the defendant knew to be a significant figure of on-line Islamic radicalization. ECF No. 55, at 5. He also sought out Sudanese cleric Sheikh Mohammed Ali al-Jazouly and expressed his desire to be a "sleeper cell."[2] *Id*. Six months prior to this, the defendant opened a Facebook account

[1] In a Facebook posting in 2013 using his pseudonym Mahmoud Al-Dongulawi IV, the defendant posted a message praising Sami Osmacak as one of our "forgotten prisoners." The defendant continued: "I saw this brother in 2009 on youtube and I wished to work with him one day, but the 1st day I came to the states I found that the disbelievers imprisoned him. May Allah release you akhe fe Allah." ECF No. 55, Exhibit H.

[2] Al Jazouly is a notorious cleric who promotes violent jihad from Sudan—a country that the defendant ostensibly would be deported. After al Qaeda leader Osama bin Laden was killed, Al Jazouly released a sermon on May 29, 2011, entitled "who Betrayed and Killed Osama Bin Laden?" Further, after ISIS leader Abu Bakr al-Baghdadi anointed

characterizing himself in the same terms, with the Arabic words for "solo wolf" imposed over an image of a stalking wolf on his Facebook page. *Id*, Exhibit B. He bragged to his associate, Joseph Farrokh, about the defendant's contacts with Sheikh al-Jazouly. *Id*. The defendant encouraged and arranged for Farrokh to leave his family and attempt to travel to Syria and Iraq to join the Islamic State. *Id*. The defendant supported Farrokh's travel even after Farrokh expressed eagerness to "chop their heads." PSR ¶ 16.

The defendant was radicalized before he met Joseph Farrokh. In 2014, the defendant created a Twitter account for himself under the pseudonym @Loverofhooreen. ECF No. 55, at 8. On March 12, 2014, the defendant tweeted, "the day you die on the sake of Allah is the dayyou are born somewhere else." *Id*. Two days later, the defendant retweeted photos of a lion and terrorist heroes, including Osama bin Laden, Anwar Aulaki, and Abu Musab Al-Zarqawi. *Id*. On March 16, 2014, the defendant retweeted a photo of dozens of men waving the black jihad flag, with the caption "hey Obama!! We are all sheikh Osam, we are all Sheikh Baghdadi." *Id*.

The defendant became friends with Joseph Farrokh in March 2015 and their friendship, and criminal activity, deepened after the defendant attended Farrokh's wedding in August 2015. *Id*. From August 2015, until their subsequent arrests, the defendant and Farrokh spoke openly with each other about supporting the Islamic State and supporting violent jihad. *Id*. They watched videos online that glorified terrorism in support of Islam, such as videos depicting sermons by Anwar Awlaki, and discussed the contents of the videos and supported the ideology promoted in the videos. *Id*. The defendant educated Farrokh about the sermons of a radical Sudanese cleric who supported the Islamic State. PSR ¶12.

In the late summer of 2015, Farrokh talked more seriously with his co-defendant about

himself Caliph of the Islamic State, and declared war against western civilization, al-Jazouly publicly praised the speech as expressing "pearls of wisdom" and characterizing Baghdadi as the grandson of the messenger.

traveling overseas and joining the Islamic State. On October 2, 2015, in a conversation about events in Syria, Farrokh told the defendant that he had no patience and that he wanted to go right away and "chop their heads." *Id* ¶16.

Shortly before 8:00 a.m., on January 15, 2016, the defendant picked-up Farrokh at his residence in Woodbridge, Virginia. *Id* ¶24. The co-defendants' plan included having the defendant drive Farrokh to a spot near the Richmond International Airport. *Id*. At a bathroom in Dale City, Farrokh shaved his beard in an effort to avoid scrutiny when he reached the airport. *Id*. After leaving Dale City, the defendant drove southbound on Interstate 95 towards Richmond. *Id*. Upon reaching the vicinity of the Richmond International Airport, the defendant and Farrokh stopped at a commercial and retail area approximately one mile from the airport. *Id* ¶ 25. The defendant and Farrokh stayed together at this commercial area for approximately two hours. *Id*. At approximately noon, the defendant called a taxicab for Farrokh. *Id*. Farrokh entered this taxicab, which drove him the approximate one mile to the Richmond International airport. The defendant departed the commercial area near the airport and drove northbound on Interstate 95. *Id*.

After several other efforts at avoiding scrutiny, Farrokh entered the airport terminal and proceeded to check-in for his flight to Jordan, *via* Chicago. Upon checking in, Farrokh cleared through the departure security area carrying two bags. Farrokh was arrested by the FBI as he was approaching his departure gate. *Id* ¶ 26.

Subsequent to Farrokh's arrest, FBI agents approached the defendant that afternoon at a location in Woodbridge, Virginia, where he voluntarily consented to an interview. During the course of the interview, the defendant verbally acknowledged to the interviewing agents more than once that he knew it was illegal to knowingly lie to federal agents. *Id* ¶28. He then

proceeded to make numerous false statements in response to the agents' questions. *Id*. The defendant admitted knowing Farrokh and stated that he had first met Farrokh approximately two months ago and that the two would occasionally talk by telephone. *Id*. When asked when he had last seen Farrokh, the defendant told the agents that it had been around 11:30 a.m. that day in the Woodbridge, Virginia area. *Id*. He further stated that Farrokh was going to the airport to fly to California to attend the funeral of a friend and that Farrokh had told him that he would be gone for two weeks. *Id*. When asked which airport Farrokh was departing from, the defendant initially hesitated then said that Farrokh was flying out of Dulles airport. *Id*.

On July 15, 2016, Farrokh was sentenced to 102 months' imprisonment on a charge of providing material support or resources to a designated foreign terrorist organization. On February 24, 2017, the defendant was sentenced to 132 months' imprisonment.

The defendant is currently incarcerated at FCI Danbury, where he is serving out his 132-month sentence. According to the Bureau of Prisons Inmate Locator, the defendant's anticipated release date is May 29, 2025.

### B. <u>Defendant's hematuria and *provisional* diagnosis of renal disease</u>

According to his Presentence Investigation Report (PSR), between on or about June 15, 2015 and June 21, 2016, the defendant advised doctors at Georgetown MedStar Hospital that he had blood in his urine as a child. PSR, at 18; ECF No. 64, at 4. After conducting tests for suspected abnormalities and diseases that yielded negative results, medical staff diagnosed the defendant with hematuria (blood in urine). *Id*.

On or about August 2, 2019, medical staff at FCI Danbury conducted a nephrology examination on the defendant. ECF No. 64, at 5. The medical staff did not diagnose the defendant with renal disease; however, the medical provider confirmed Georgetown MedStar

Hospital's diagnosis that the defendant has hematuria.[3] *Id*.

On or about May 15, 2020, medical staff at FCI Danbury again confirmed Georgetown MedStar Hospital's diagnosis that the defendant has hematuria. *Id* at 8. Noting that the defendant reported a family history of renal failure, medical personnel scheduled another nephrology examination for November 2020.

On or about June 26, 2020, medical staff noted that the defendant's blood work necessitated further review. ECF No. 64, Exhibit B (filed under seal). Accordingly, medical personnel issued a *provisional* diagnosis of moderate to severe renal disease.[4] *Id*. Ultimately, the nephrology consultation was rescheduled for December 10, 2020. *Id*. In or around early December 2020, the nephrology consultation was again rescheduled for February 8, 2021.[5]

Between in or around June 2020 and December 2020, the defendant's medical records indicate that the defendant's medical condition has not worsened since his provisional diagnosis, nor has he experienced any demonstrable issues with his kidneys. The defendant reports a family history of renal failure, and includes several references in his motion to renal and/or organ failure with respect to the defendant himself. *See, e.g*. ECF No. 64, at 1, 2, 3, 8. However, the defendant's medical records do not substantiate the assertion that the defendant is suffering from renal failure, or that renal failure is imminent. To be clear, the defendant does not have renal failure, nor does he have a definitive diagnosis of moderate or severe renal disease. Instead, his medical records corroborate the fact that the defendant has hematuria.

[3] Medical personnel indicated that the defendant was to be seen for a follow-up nephrology appointment three months later, but for unknown reasons, that appointment was never made.
[4] According to the National Institute of Health, a provisional diagnosis is issued when medical personnel suspect a particular disorder is present but realizes that more information is required to be confident of a specific diagnosis.
[5] The United States is currently working with BOP in an effort to move the nephrology consultation to an earlier date, if possible.

**C. Defendant's representations regarding potential immigration proceedings and proposed alternative relief**

In a footnote to his motion, the defendant represented that he was "willing to forgo any objections he might have to his removal from the country" due to what he characterizes as the need for immediate medical care. ECF No. 64, fn 2. However, that same filing also asserts that "Mr. Elhassan has an extremely loving and supportive family who would gladly welcome him back into the family home in Woodbridge, Virginia" to help him get what he characterizes as "immediate specialized care."[6] *Id* at 28. This contradiction calls into question the defendant's sincerity in abiding by what would ultimately be an unenforceable waiver. Moreover, the defendant's contradictory statements presented a stark decision for the United States as it weighed the risks in potentially supporting the compassionate release of an individual who was convicted of both supporting ISIS and making false statements.

As described in ECF No. 70, the United States coordinated with defense counsel and Immigration and Customs Enforcement (ICE) to collect the information necessary to understand the ramifications of the defendant's offer to forgo objections to the immigration proceedings. The United States also expressed a willingness to support the defendant's release and concession of his removal, subject to 1) receiving additional information confirming the defendant's diagnosis, and 2) illuminating any potential immigration issues that may impact the defendant's offer to be removed from the country and forgo his objections to removal. To this end, the Court granted an extension of time for the United States to respond to the defendant's motion for compassionate release. ECF No. 71.

In light of the facts presented in this case, including the due diligence that was conducted in

[6] At least two additional documents submitted by the defendant relevant to the instant litigation also referenced his desire to return to his family's home in Woodbridge, Virginia. ECF 61, at 4; ECF 64, at 18.

conjunction with the extension of time granted by the Court, the United States cannot support early termination of the defendant's prison term under the compassionate release provision in 18 U.S.C. § 3582(c)(1)(A)(i). Quite frankly, the defendant was convicted of attempting to provide material support to a foreign terrorist organization and making false statements. The reason these convictions are particularly salient here is because the success of any waiver in this context depends on the defendant keeping his word. Beyond the myriad other risk factors involving a defendant convicted of terrorism-related charges, the defendant's convictions in this case raise significant doubts that he can be trusted.

As the defendant acknowledges in his motion, the felony conviction appears to be sufficient to place the defendant into removal proceedings should this Court grant the defendant's request. ECF No. 64, fn 2. However, the immigration courts do not have a mechanism to enforce any waivers or commitments made by the defendant once he is released from a district court's jurisdiction. As such, once the defendant is released into ICE custody, he would still have the opportunity to raise claims with the immigration judge or otherwise decide against requesting a removal order, despite whatever assurances he asserts to this Court. Accordingly, any such waiver made by the defendant is only as good as his word.[7]

Indeed, the defendant seemingly telegraphs his intentions in how he envisions returning to the family home in Woodbridge, Virginia. For example, he writes that "Mr. Elhassan could conceivably be granted bail in the context of his immigration proceedings. That is a separate determination made by an Immigration Judge, and should not be pre-determined in the context of

[7] The proposed course of action presented by the defendant also involves several logistical issues with respect to the removal itself. For example, the facts surrounding this particular defendant render an unpredictable amount of time that the defendant may spend in ICE custody. The reasons include the country of repatriation and the fact that, on information and belief, the defendant may not have valid travel documents. The amount of time spent in ICE detention upon his release from prison is relevant because it can result in a *habeas corpus* petition and/or release into the community, regardless of any waiver made to this Court. *See Zadvydas v. Davis*, 533 U.S. 678 (2001).

this motion, which presents different questions resolved pursuant to different standards." ECF No. 64, at 29. While the defendant also references the fact that he ultimately could be removed from the United States—or as he ambiguously puts it, "voluntary or not"—removal appears to be more of a contingency plan. *Id*.

The United States opposes the defendant's request for compassionate release. There are way too many risks and unknowns should the defendant be released. However, in the alternative, to the extent this Court disagrees with the United States' position, it respectfully requests that this Court 1) require the defendant to agree, in writing, to the following waiver prior to a final decision regarding early termination of the defendant's prison term, and 2) impose a term of supervised release with the condition that the defendant must continue to adhere and abide by his waiver of rights with respect to any and all forms of relief or protection from removal, deportation, or exclusion under the Immigration and Nationality Act (INA), as amended, and related federal regulations, for the duration of the mandated term of supervised release, pursuant to 18 U.S.C. § 3582(c)(1)(A):

> The defendant agrees to waive his rights to any and all forms of relief or protection from removal, deportation, or exclusion under the Immigration and Nationality Act (INA), as amended, and related federal regulations. These rights include, but are not limited to, the ability to apply for the following forms of relief or protection from removal: asylum; withholding of removal under Title 8, United States Code, Section 1231(b)(3); any protection from removal pursuant to Article 3 of the United Nations Convention Against Torture, including withholding or deferral of removal under 8 C.F.R. § 208; cancellation of removal; adjustment of status; registry; *de novo* review of a denial or revocation of temporary protected status (current or future); waivers under Title 8, United States Code, Sections 1182(h) or 1182(i); visa petitions; consular processing; voluntary departure or any other possible relief or protection from removal available under the Constitution, laws or treaty obligations of the United States. As part of this agreement, the defendant specifically acknowledges and states that the defendant has not been persecuted in, and has no present fear of persecution in Sudan and/or Egypt on account of his race, religion, nationality, membership in a particular social group, or political opinion. Similarly, the defendant further acknowledges and states that the defendant has not been

tortured in, and has no present fear of torture in Sudan and/or Egypt.

## RESPONSE

### I. The Court should weigh a number of practical considerations in evaluating defendant's request for compassionate release.

The Federal Bureau of Prisons ("BOP") is actively working to contain the spread of the coronavirus within prisons. BOP has, among other steps, limited access to prisons, restricted prisoner movements within prisons, used screening and testing, sought to educate inmates and staff on preventing the spread of disease, provided masks and hand cleaners, separated ill inmates, and—in appropriate cases—released inmates for home confinement under 18 U.S.C. § 3624(c)(2), as amended by § 12003(b)(2) of the CARES Act.[8] This last step carries special importance for defendant's request for compassionate release.

Before the CARES Act was passed, § 3624(c)(2) provided BOP with the exclusive authority to "place a prisoner in home confinement for the shorter of 10 percent of the term of imprisonment of that prisoner or 6 months." This provision is in keeping with BOP's authority to designate where an inmate serves a sentence. Congress has now, temporarily, expanded § 3624(c)(2), while leaving its application to BOP. As part of the CARES Act, Congress sought to address the spread of the coronavirus in prison by permitting BOP to expand the use home confinement under § 3624(c)(2). Section 12003(b)(2) of the Act suspends, during the coronavirus emergency, the limitation in § 3624(c)(2) that restricts home confinement to the shorter of 10 percent of the inmate's sentence or 6 months, once the Attorney General makes requisite finding that emergency conditions will materially affect the function of BOP.[9] The Attorney General made those findings

[8] *See* Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, 134 Stat. 281 (2020) ("CARES Act").

[9] Section 12003(b)(2) provides that "if the Attorney General finds that emergency conditions will materially affect the functioning of the Bureau, the Director of the Bureau may lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement under the first sentence of section 3624(c)(2) of title 18,

on April 3, 2020, conferring on BOP the authority to expand its use of home confinement.

Since March 26, 2020, BOP has placed over 17,000 inmates on home confinement (*see* https://www.bop.gov/coronavirus/index.jsp), focusing on, among other factors, the vulnerability of particular inmates, the prisons most at risk, and the dangers posed by inmates if released. Inmates do not have to apply to be considered for home confinement.

In weighing the appropriateness of home confinement, BOP considers, among other factors, whether a home is available where the inmate could be confined, whether the inmate could receive appropriate food and medical care there, the comparative risk to the inmate in home confinement in the identified location versus remaining in prison, the inmate's risk to the public through recidivism, and the availability of supervision during home confinement or risk to the public if supervision is lacking. BOP also seeks to ensure that the inmates it releases to home confinement are not already ill and therefore spreading infection to others—including spreading illness to the individuals who would be needed to make home confinement successful. To help accomplish that goal, BOP is requiring a 14-day quarantine period before any inmate is released to home confinement.

In addition to these efforts to increase the use of home confinement, BOP is continuing to accept and review requests for compassionate release under 18 U.S.C. § 3582(c)(1)(A).

Current modified operations plan require that all inmates in BOP institutions be secured in their assigned cells/quarters for a period of at least 14 days to stop any spread of the disease. Only limited group gatherings are permitted, with social distancing required to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. Further, BOP has severely limited the movement of inmates and detainees among its facilities. Though

United States Code, as the Director determines appropriate."

there will be exceptions for medical treatment and similar exigencies, this step also limits transmission.

All staff and inmates have been and will continue to be issued an appropriate face covering and strongly encouraged to wear the face covering when in public areas when social distancing cannot be achieved. Every newly admitted inmate is screened for COVID-19 risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation. In addition, in areas with sustained community transmission and at medical centers, all staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. A staff member with a stuffy or runny nose can be placed on leave by a medical officer.

Contractor access to BOP facilities is restricted to only those performing essential services (*e.g.*, medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems. All volunteer visits are suspended absent authorization by the Deputy Director of BOP. Any contractor or volunteer who requires access will be screened for symptoms and risk factors.

Social and legal visits were stopped as of March 13, 2020, and presently remain suspended to limit the number of people entering the facility and interacting with inmates. To ensure that familial relationships are maintained throughout this disruption, BOP has increased detainees' telephone allowance to 500 minutes per month. Tours of facilities are also suspended. Legal visits will be permitted on a case-by-case basis after the attorney has been

screened for infection in accordance with the screening protocols in place for prison staff, contractors, and visitors.

Further details and updates of BOP's modified operations are available to the public on the BOP website at a regularly updated resource page: www.bop.gov/coronavirus/index.jsp.

Rather than relying on BOP to address what both Congress and the Attorney General have determined is a time-sensitive, rapidly evolving emergency—and after Congress placed a specifically targeted tool in the hands of BOP via § 12003(b)(2) of the CARES Act—defendant envisions a system where hundreds of federal district judges around the country try to use the tools of litigation to replicate, and potentially override, BOP's efforts. And critically, under defendant's approach, courts must attempt to assess facts that can change within days—if not hours—when many of the changing circumstances could nullify the intended goal of any court order.

In any event, the Court's adjudication of the defendant's motion necessarily touches on many of the following fact-specific issues:

- *Safety of place of home detention*. An inmate's proposed residence after release from prison should be a place where no person is infected or soon to be infected.

- *Avoiding recidivism*. The conditions and place where a defendant will stay after release must limit the risk of recidivism—an important consideration given that federal inmates have a re-arrest rate that ranges from 30.2% for inmates with no criminal history points to 85.7% for inmates with 15 or more criminal history points.[10] New arrests not only endanger the public and return an inmate to prison, but also increase the dangers to arresting officers and supervising probation officers.

- *Protecting the public from infection*. Any release should include measures to assure that an inmate who is presently incarcerated is not infected by the time that the Court ordered any release, undermining the benefits of the release;

- *Evaluating how much of a difference a defendant's proposal would make to*

[10] *See* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170309_Recidivism-CH.pdf#page=12.

*disease transmission inside defendant's prison*. Before a defendant receives the benefit of being released from prison, a court should determine the extent to which releasing a particular inmate makes a difference to disease transmission in one of the 30 BOP facilities and 6 residential reentry centers that BOP is monitoring for coronavirus infections, *See* https://www.bop.gov/coronavirus/;

- *Assessing how much release would affect the particular inmate's health*. To justify cutting short an inmate's sentence, a defendant's release should make a sufficiently great improvement to the odds of maintaining an inmate's health.

This list is not exhaustive and, indeed, could include many additional considerations. The key point is that, in light of the BOP's efforts to control the spread of COVID-19, the Court should exercise its discretion in such a way as to grant compassionate release only where the defendant's medical situation, the presence of coronavirus at his facility of confinement, and the statutory sentencing factors support doing so. For the reasons that follow, this is not such a case.

## II. The Fourth Circuit's decision in *United States v. McCoy* does not entitle the defendant to relief from stacked sentences as a matter of right.

In *United States v. McCoy*, — F.3d —, 2020 WL 7050097 (4th Cir. Dec. 2, 2020), the Fourth Circuit held that the policy statement found in U.S.S.G. § 1B1.13 does not apply to compassionate release motions brought by inmates under 18 U.S.C. § 3582(c)(1)(A)(i). *Id*. at *6–9. According to *McCoy*, because § 1B1.13 specifics its applicability only to motions brought by the Bureau of Prisons, it cannot be the policy statement applicable in circumstances where defendants bring their own motions for compassionate release. *Id*. In place of the no-longer-applicable policy statement, *McCoy* permits "courts [to] make their own independent determinations of what constitutes an 'extraordinary and compelling reason[ ]' under § 3582(c)(1)(A), as consistent with the statutory language[.]" *Id*. at *9.

*McCoy* noted, however, that § 1B1.13 "remains helpful guidance even when motions are filed by defendants." *Id*. at *7 n.7. In stating as such, *McCoy* approvingly cited the Seventh Circuit's recent

decision in *United States v. Gunn*, — F.3d —, 2020 WL 6813995, at *2 (7th Cir. Nov. 20, 2020), which similarly held that there currently exists no applicable policy statement for compassionate release motions brought by inmates. Nonetheless, the Seventh Circuit explained that § 1B1.13 remains useful in framing a court's inquiry as to what constitutes "extraordinary and compelling reasons." As it stated, "[t]he statute itself sets the standard: only "extraordinary and compelling reasons" justify the release of a prisoner who is outside the scope of § 3582(c)(1)(A)(ii). The substantive aspects of the Sentencing Commission's analysis in § 1B1.13 and its Application Notes provide a working definition of "extraordinary and compelling reasons"; a judge who strikes off on a different path risks an appellate holding that judicial discretion has been abused. In this way the Commission's analysis can guide discretion without being conclusive." *Id*. (citing *Gall v. United States*, 552 U.S. 38, 49–50 (2007); *Kimbrough v. United States*, 552 U.S. 85 (2007)). Thus, although *McCoy* broadened district courts' discretion under § 3582(c)(1)(A), it nonetheless appeared to envision a system whereby courts remain confined within a traditional discretionary framework.

*McCoy* also held that in considering whether extraordinary and compelling reasons exist for a sentence reduction, district courts are permitted to consider the "unusual length" of a sentence as well as the "'gross disparity' "between those sentences and the sentences Congress now believes to be an appropriate penalty for the defendants' conduct." 2020 WL 7050097, at *10. With that understanding, *McCoy* concluded that Congress' recent amendments to the stacking provisions of 18 U.S.C. § 924(c), could, when coupled with other defendant-specific factors, constitute extraordinary and compelling reasons under § 3582(c)(1)(A)(i). *Id*. *McCoy* did not hold, however, that the existence of stacked § 924(c) sentences necessarily satisfied the requirements of § 3582(c)(1)(A)(i) in *all* cases. Instead, it held that courts "may consider" that "defendants are serving sentences that Congress itself views as dramatically longer than necessary or fair." *Id*. *McCoy* also stressed that the "extraordinary

and compelling" prong of § 3582(c)(1)(A)(i) was a "heightened standard," and that "only those defendants who can meet the heightened standard of 'extraordinary and compelling reasons' may obtain relief." *Id*. at *11. As the court put it, "it was not unreasonable for Congress to decide that it did not want sentence reductions based on § 403 of the First Step Act to be as widely available as relief under § 404 – and thus to limit those reductions to truly extraordinary and compelling cases." *Id*.

In its broadest terms, *McCoy* thus holds that although § 1B1.13 is no longer the applicable policy statement for compassionate release motions brought by inmates, defendants still must meet the "heightened standard" required by § 3582(c)(1)(A)(i). Both before and after *McCoy*, defendants must clear the "extraordinary and compelling" threshold set forth in the statute. As *McCoy* put it, such relief will be granted in "truly exceptional cases[.]" *Id*. at *12. In other words, the defendant must present circumstances that are "[b]eyond what is usual, customary, regular, or common," Extraordinary, *Black's Law Dictionary* (11th ed. 2019), or "go[] beyond what is usual, regular, or customary," or that are "exceptional to a very marked extent." "Extraordinary." *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/extraordinary. Accessed 3 Dec. 2020. *McCoy* does nothing to displace that "heightened standard." This is particularly the case in the context of § 924(c), which Congress amended but in a way that only explicitly benefits defendants sentenced after the First Step Act's enactment. *See United States v. Jordan*, 952 F.3d 160, 171–74 (4th Cir. 2020). If the mere existence of stacked § 924(c) sentences in a defendant's case was sufficient to constitute an extraordinary and compelling reason, § 3582(c)(1)(A)(i)'s use of the phrase "extraordinary and compelling" would reduce to nothingness. There is, of course, nothing extraordinary about a sentence imposed in thousands of cases a year. *See United States v. Mathis*, 2020 WL 6784136, at *2 (E.D.N.Y. Nov. 18,

2020) ("[G]iven that numerous defendants remain incarcerated on sentences that may have been shorter if they had been sentenced [under current law], I do not find this reason so extraordinary and compelling as to warrant a sentence reduction on its own.").

In *McCoy*, the Fourth Circuit stated that a district court must make an individualized inquiry in each case, and noted that the district courts at issue relied upon individual circumstances of the appellants. 2020 WL 7050097, at *11. The defendant in this case fails to meet the heightened standard required by § 3582(c)(1)(A)(i), and the defendant specific factors including the underlying facts of his crimes do not support granting his request for compassionate release. In this case, the defendant was actively working to support the brutal, deadly mission of ISIS, by assisting ISIS supporters within the United States and communicating with terrorist sympathizers elsewhere, including his native Sudan. Accordingly, his motion for compassionate release should be denied for a number of reasons as described herein.

## III. This Court must first determine whether the defendant has exhausted his administrative review with BOP Officials prior to judicial action.

Under § 3582(c)(1)(A), a defendant must first exhaust his administrative remedies with the BOP prior to presenting his motion to the Court. Section 3582(c)(1)(A) unambiguously permits a motion to the Court only "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the Warden of the defendant's facility, whichever is earlier."

In this case, in or around April 2020 and May 2020, the defendant submitted requests to the Warden of FCI Danbury, requesting compassionate release. The defendant's requests were denied.

Based on these facts, 30-days have passed from the April 2020 date when the defendant

submitted his first letter to the Warden requesting compassionate release. Accordingly, the defendant appears to have met the 30-day requirement to exhaust his BOP administrative remedies.

**IV. The defendant has not established a sufficient basis for compassionate release.**

The defendant has not established a basis for the relief sought. The defendant bears the burden to demonstrate that he is entitled to compassionate release under § 3582(c)(1)(A)(i). *See White v. United States*, 378 F. Supp. 3d 784, 785 (W.D. Mo. 2019); *see also generally Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 56–57 (2005) ("Absent some reason to believe that Congress intended otherwise … the burden of persuasion lies … upon the party seeking relief."). Compassionate release is not appropriate on these facts because the defendant has not established "extraordinary and compelling reasons" for such relief under § 3582(C)(1)(A)(i).

Courts have generally agreed the existence of the pandemic, standing alone, is not a sufficient basis for granting compassionate release. As the Third Circuit put it, "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020). Instead, courts in this district have found "extraordinary and compelling reasons for compassionate release [on the basis of COVID-19] when an inmate shows both a particularized susceptibility to the disease and a particularized risk of contracting the disease at his prison facility." *United States v. White*, — F. Supp. 3d —, 2020 WL 1906845, at *1 (E.D. Va. Apr. 17, 2020) (quoting *United States v. Feiling*, 453 F. Supp. 3d 832, 841 (E.D. Va. 2020)).[11]

[11] *See also United States v. Little*, No. 1:10-CR-135 (CMH), 2020 WL 3442173, at *2 (E.D. Va. June 23, 2020) (adopting the criteria from *Feiling*); *United States v. White*, No. 3:18-CR-61 (HEH), 2020 WL 3442171, at *5 (E.D. Va. June 23, 2020) ("Defendant's request for release on home confinement is based upon nothing more than 'the mere

Because the defendant has not satisfied these criteria, the Court should deny his motion.

### A. The defendant's medical records—to date—do not demonstrate that he faces higher susceptibility to COVID-19.

The defendant has failed to meet his burden of showing that "extraordinary and compelling reasons" exist to warrant early compassionate release pursuant to § 3582(c)(1)(A)(i). His motion frequently invokes medical conditions such as "end-stage renal failure" and "kidney failure." *See, e.g*. ECF No. 64, at 1, 2, 3, 8. But this Court should not be steered into believing that the defendant has ever been diagnosed with such a condition. He has not. Instead, the defendant's medical records confirm that he has chronic hematuria, which is blood in his urine. The hematuria has been managed over the years. Any assertion that the defendant is on the verge of "kidney failure" is speculative at best.

On or about August 2, 2019, the defendant received a nephrology consultation where medical personnel found no evidence of moderate to severe renal disease. The medical provider did confirm that the defendant has hematuria, a diagnosis that continues to be made. ECF No. 64, at 5. To be sure, on or about June 26, 2020, medical staff observed that the defendant had some test results necessitating further review. *Id* at 9. As such, medical personnel issued a *provisional* diagnosis of moderate to severe renal disease. *Id*. A provisional diagnosis is essentially a placeholder until more information can be obtained.

To date, the defendant has not been definitively diagnosed beyond the hematuria. The defendant's claim that he is suffering the "beginnings of organ failure" is inaccurate and unsupported by his medical records. ECF No. 64, at 1. Even if a firm diagnosis eventually posited that the defendant has moderate to severe renal disease, this still would not necessarily equate to

---

possibility that COVID-19 will spread to his facility'-a fear that is insufficient to justify release."(citing *Feiling*)).

"organ failure." Overall, the defendant's motion appears to be making a concerted effort to shoehorn the defendant's reported family history of liver and kidney disease as a substitute for the defendant's hematuria and more recent provisional diagnosis. As things currently stand, the defendant's medical issues are being appropriately and effectively managed, and BOP officials confirmed to the undersigned counsel that, as of in or around mid-December 2020, the defendant's health remains stable.

The defendant's next nephrology consultation was rescheduled by the provider until February 8, 2021. Until his next appointment is conducted and a firm diagnosis is made, it is impossible to predict whether the defendant's medical history rises to the level of extraordinary and compelling reasons for compassionate release. Therefore, the defendant fails to meet his burden based on the current facts.

However, the United States recognizes that the facts could change in the future. To date, it remains unknown what sort of diagnosis, if any, will result from the defendant's next nephrology consultation. It could turn out to be relatively minor like the 2019 nephrology determination. Or it could be something else. Until a medical professional is able to provide a definitive diagnosis, we can only speculate. As such, this Court does have the option to reject the defendant's request, with the caveat that he may file another motion if the defendant is definitively diagnosed with a medical condition akin to organ failure. In the alternative, the Court could hold its final determination in abeyance until the defendant receives a definitive diagnosis regarding his medical condition.

**B. The defendant has not shown that his prison facility is at heightened risk of a coronavirus outbreak.**

According to the latest statistics available from the BOP, as of on or about December 9, 2020, FCI Danbury has 23 inmates (out of 899) testing positive for COVID-19.[12] According to BOP,

---

[12] BOP statistics can be viewed at https://www.bop.gov/coronavirus/index.jsp.

among other precautions, inmates are going out to recreation, unit by unit, so that there is no interaction between the various housing units in an effort to reduce the risk of COVID-19 spread. Inmates also are being tested for COVID-19. As of in or around early December 2020, the defendant's tests revealed that he remains negative for COVID-19.

This certainly was not always the case. As the defendant correctly points out, in or around March 2020, numerous FCI Danbury inmates—including the defendant—tested positive for COVID-19. ECF No. 64, at 6. But since that time, FCI Danbury has gotten the virus under control and significantly reduced its number of infections to 23 out of 899. Accordingly, the facts do not show, in any particularized fashion, that the defendant is entitled to additional relief based on the risk of contracting COVID-19.

Regarding his positive COVID-19 diagnosis in March 2020, the defendant suggests he is concerned about long-term effects and the threat of re-infection. ECF No. 64, at 13. But the defendant's primary complaint is with the prison's Home Confinement Review Committee, which was formed as part of the *Martinez-Brooks v. Easter & Carvajal* class action settlement that arose as a result of the spring 2020 COVID-19 cases at FCI Danbury. ECF No. 64, at 19. Specifically, the defendant laments that his request for home confinement was denied. *Id*. The defendant further bemoans the reasons for the decision: Denial that he had any significant health risks, his terrorism offense, and the ICE detainer. *Id*.

Despite the defendant's protestations, he is not entitled to early release, particularly based on the facts. And in this instance, the Home Confinement Review Committee got the facts correct. As described *supra,* the defendant to date does not have any confirmed significant health risks beyond the hematuria. He is not at the "beginnings of organ failure" as the defendant argues, without substantiation. And the provisional diagnosis of moderate to severe renal disease is merely

speculative at this point.

Although the facts could change down the road, nothing in the defendant's medical records currently demonstrates that this defendant—an individual convicted of terrorism-related offenses—is at any sort of heightened risk of being re-infected with COVID-19 by remaining at FCI Danbury. For the defendant, he is housed in a facility where only a small portion of inmates are infected with COVID-19, and the defendant has not articulated any sort of heightened medical risk other than his own skewed interpretation of his medical condition. Accordingly, FCI Danbury poses no extraordinary or compelling risks to the defendant.

**C. The defendant has not provided a realistic or viable release plan regarding his risk of contracting COVID-19.**

In light of the risks posed by his release, the defendant does not have a realistic release plan. His release plan hinges on "a strong family support system that will help him reintegrate into society" from his family home in Woodbridge, Virginia. ECF No. 64, at 28. This release plan is flawed from the start.

As the defendant acknowledges, to the extent he is released, he would not return to his family home in Virginia. Instead, the defendant would be transferred into ICE custody based on an ICE detainer. ECF No. 64, at 29. Seemingly recognizing this gaping hole in his plan, the defendant attempts to wish it away by arguing that ICE detention is somehow better than remaining at FCI Danbury. But the facts prove otherwise. FCI Danbury has largely gotten control of the COVID-19 issues that had persisted during the spring. The defendant's argument latches onto the past problems but fails to acknowledge the present conditions at the prison. Similarly, the defendant fails to recognize that COVID-19 case rates among ICE detainees may be 13 times the rate of the United States population, according to the American Medical Association's JAMA Network. As such, granting compassionate release in this case may well serve to, as one court put

it, "simply take him out of the proverbial frying pan and place him into the fire . . ." *United States v. Brady*, No. 18-CR-316 (PAC), 2020 WL 2512100, at *4 (S.D.N.Y. May 15, 2020).

To be sure, the defendant recognizes that he ultimately could be deported, "voluntary or not." ECF No. 64, at 29. But his contingency plan involves deportation to Sudan or Egypt. *Id*. According to CDC Travel Notices, as of in or around mid-December 2020, both Sudan and Egypt are rated as Level 4 countries—the highest level for contracting COVID-19.[13]

If granted compassionate release, the defendant's release plan would instantly fail. He would immediately be transferred into ICE custody. Depending on various, unknown factors, the defendant could be deported to Sudan, a country that the CDC advises against traveling, or he could be deported to Egypt, another country the CDC advises against traveling. As such, there is only one recourse the defendant could have in salvaging his release plan. He could fight deportation. He could backtrack on any promise he makes to this Court and pursue his release into the community in Virginia.[14] And being that the defendant is convicted of terrorism-related offenses, the community could be at risk.

Presently, medical staff at FCI Danbury are visiting, assessing, and treating patients on a daily basis, while wearing protective equipment and taking appropriate precautions. Based on these facts, it is simply not the case that this defendant would have greater, unfettered access to medical care during this pandemic if released, particularly if the defendant is transferred into ICE custody.

---

[13] The CDC Travel Notices can be found here: https://wwwnc.cdc.gov/travel/notices/covid-4/coronavirus-sudan; https://wwwnc.cdc.gov/travel/notices/covid-4/coronavirus-egypt

[14] Or in the defendant's words, "Mr. Elhassan could conceivably be granted bail in the context of his immigration proceedings. That is a separate determination made by an Immigration Judge, and should not be pre-determined in the context of this motion, which presents different questions resolved pursuant to different standards." ECF No. 64, at 29.

**D. In the exercise of its discretion, the Court should deny compassionate release in light of the statutory sentencing factors.**

Compassionate release is only appropriate where the "defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2). That statute instructs the court to consider several factors, including whether the underlying offenses constitute a federal crime of terrorism. Even if the defendant has presented extraordinary and compelling reasons, the Court, in an exercise of its discretion, should deny compassionate release in light of the statutory sentencing factors. Under § 3582(c)(1)(A), a court may reduce a defendant's sentence, only after considering the factors set forth in 18 U.S.C. § 3553(a). Here, these factors counsel against granting a reduction in the defendant's case.

As an initial matter, the defendant's offenses were indisputably crimes of terrorism. He subscribed to—even relished—ISIS's barbaric and violent ways. In fact, the defendant believed in the ISIS ideology so much that he worked to recruit others to his cause.[15] PSR at 19. At one point, the defendant's associate and fellow ISIS supporter expressed impatience and wanted to immediately leave Northern Virginia to "chop their heads." *Id* ¶ 16-26. If there ever was a point where the defendant should have turned back, that was the time. But he didn't. Instead, the defendant worked to ensure that his associate could depart from the United States in order to "chop their heads." *Id*. And when the FBI finally confronted the defendant? He lied. *Id* ¶ 28. The defendant made whatever false statements he could so that his associate could continue on with his mission. *Id*.

The defendant is convicted of attempting to support ISIS. He also is a convicted liar. There

[15] In June 2014, the defendant also informed Sudanese cleric Sheikh Mohammed Ali al Jazouly that the defendant was "here with you is a sleeper cell." ECF No. 55, Exhibit C. Notably, Sheikh al Jazouly is located in Sudan, one of the countries listed for potential deportation in the defendant's release plan. The defendant also referred to himself as a "solo wolf." *Id*, Exhibit B.

is nothing in the defendant's motion that justifies early release for a man convicted of such severe offenses.[16] By the very nature of his convictions, the defendant's words and intentions are circumspect.[17] Indeed, the defendant's own convoluted release plan leaves significant doubt about his true intentions with respect to his representations to this Court. This convicted ISIS supporter should not be compassionately released back into the community. The risks and unknowns are much too great.

* * *

If this Court were to disagree with the United States' position, the United States proposes the following alternative form of relief:

> Based on the defendant's representation to this Court that he is "willing to forgo any objections he might have to his removal from the country," to the extent this Court determines that the defendant meets his burden for compassionate release, the United States respectfully requests that 1) this Court require the defendant to agree, in writing, to the

[16] To be sure, the government credits the defendant for making efforts to improve himself while incarcerated. To that end, the defendant has availed himself of the educational and vocational opportunities offered by FCI Danbury, and this should be commended. But in the end, the defendant's evidence of rehabilitation does not amount to an extraordinary and compelling circumstance justifying compassionate release. Congress has expressly directed that "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason" to grant compassionate release, 28 U.S.C. § 994(t).

[17] *See, e.g., United States v. Chambliss*, 948 F.3d 691, 693–94 (5th Cir. 2020) (affirming denial of compassionate release in light of the defendant's "'severe' conduct, his serious drug crime, and his criminal history, which included aggravated robbery"); *United States v. Pawlowski*, — F. App'x—, 2020 WL 3483740, at *2 (3d Cir. June 26, 2020) (affirming denial of relief where release "would effectively reduce Pawlowski's sentence from 15 years to less than two years' imprisonment"); *United States v. Kincaid*, 802 F. App'x 187, 188 (6th Cir. 2020) ("Despite Kincaid's assertion that the amount of time served is not a proper basis for denying compassionate release, the need to provide just punishment, the need to reflect the seriousness of the offense, and the need to promote respect for the law permit the court to consider the amount of time served in determining whether a sentence modification is appropriate."); *Porter-Eley, v. United States*, No. 4:16-CR-89 (RAJ), 2020 WL 3803030, at *3 (E.D. Va. July 6, 2020) ("Petitioner has served a small percentage of her term of incarceration implicating the need for deterrence and a sentence that reflects the seriousness of her offense."); *United States v. Bogdanoff*, F. Supp. 3d 653, 658 (E.D. Pa. 2020) (denying compassionate release where the inmate had served only seven years of an 18-year sentence, and noting that the case was "much different than others where defendants [sought compassionate release] at the end of their sentence"); *United States v. Moskop*, No. 11-CR-30077 (SMY), 2020 WL 1862636, at *1–2 (S.D. Ill. Apr. 14, 2020) (denying compassionate release where the inmate had served less than 10 years of a 20-year sentence and explaining that the "sentencing objectives of specific deterrence and protecting the public [would] not [be] fully served by less than 10 years of incarceration").

following waiver prior to a final decision regarding early termination of the defendant's prison term, and 2) impose a term of supervised release with the condition that the defendant must continue to adhere and abide by his waiver of rights with respect to any and all forms of relief or protection from removal, deportation, or exclusion under the Immigration and Nationality Act (INA), as amended, and related federal regulations, for the duration of the mandated term of supervised release, pursuant to 18 U.S.C. § 3582(c)(1)(A):

> The defendant agrees to waive his rights to any and all forms of relief or protection from removal, deportation, or exclusion under the Immigration and Nationality Act (INA), as amended, and related federal regulations. These rights include, but are not limited to, the ability to apply for the following forms of relief or protection from removal: asylum; withholding of removal under Title 8, United States Code, Section 1231(b)(3); any protection from removal pursuant to Article 3 of the United Nations Convention Against Torture, including withholding or deferral of removal under 8 C.F.R. § 208; cancellation of removal; adjustment of status; registry; *de novo* review of a denial or revocation of temporary protected status (current or future); waivers under Title 8, United States Code, Sections 1182(h) or 1182(i); visa petitions; consular processing; voluntary departure or any other possible relief or protection from removal available under the Constitution, laws or treaty obligations of the United States. As part of this agreement, the defendant specifically acknowledges and states that the defendant has not been persecuted in, and has no present fear of persecution in Sudan and/or Egypt on account of his race, religion, nationality, membership in a particular social group, or political opinion. Similarly, the defendant further acknowledges and states that the defendant has not been tortured in, and has no present fear of torture in Sudan and/or Egypt.

Or:

To the extent this Court's determination hinges on the results of the defendant's upcoming nephrology consultation—currently scheduled for February 8, 2021—the United States respectfully requests that this Court hold its final determination in abeyance until the defendant receives a definitive diagnosis regarding his medical condition.

## CONCLUSION

For the foregoing reasons, the Court should deny the defendant's motion for compassionate release.

Respectfully submitted,

G. Zachary Terwilliger
United States Attorney

Dated: December 17, 2020

By: /s/

Michael J. Lebowitz
Special Assistant United States Attorney
Tony R. Roberts
Assistant United States Attorney
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
Telephone Number: (703) 838-2621
Facsimile Number: (703) 299-3980
E-mail Address: michael.lebowitz2@usdoj.gov

## CERTIFICATE OF SERVICE

I certify that on December 17, 2020, I filed electronically the foregoing with the Clerk of Court using the CM/ECF system, which will serve all counsel of record.

/s/

Michael J. Lebowitz
Special Assistant United States Attorney
Office of the United States Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314
(703) 838-2621
michael.lebowitz2@usdoj.gov